FREDERIC R. HARRIS, INC., )
 )
  Plaintiff/Appellant, )  Appeal No.
 )  01-A-01-9803-CH-00130
v. )
 )  Davidson Chancery
THE METROPOLITAN )  No. 95-537-II
GOVERNMENT OF NASHVILLE )
and DAVIDSON COUNTY, )
TENNESSEE, )
 )
  Defendant/Appellee. )
 )

FILED

March 25, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY,

AT NASHVILLE, TENNESSEE

THE HONORABLE CAROL L. McCOY, CHANCELLOR

PETER H. CURRY
Tuke Yopp & Sweeney
NationsBank Plaza, Suite 1100
414 Union Street
Nashville, Tennessee 37219
 ATTORNEY FOR PLAINTIFF/APPELLANT

JOHN L. KENNEDY
Metropolitan Attorney
The Department of Law of The
Metropolitan Government of
Nashville and Davidson County
204 Metropolitan Courthouse
Nashville, Tennessee 37201
 ATTORNEY FOR DEFENDANT/APPELLEE

REVERSED AND REMANDED

WILLIAM B. CAIN, JUDGE

# O P I N I O N

Frederic R. Harris, Inc. (FRH), formerly PRC Engineering, Inc., entered into a contract with the Metropolitan Government of Nashville and Davidson County (Metro), whereby FRH agreed to provide computer design services to Metro on a cost-plus-fee basis. FRH promised to provide engineering services for the design and implementation of a Computerized Traffic Signal System for Metro. The original contract, dated October 21, 1985, provided for the compensation and performance of one "System Design Phase" with an option to continue the relationship over five additional phases. The eventual goal was that this new system would utilize a special type of software to control traffic at five hundred and fifty (550) intersections throughout the city of Nashville.

I. Contract Terms

The documents executed by the parties contained ten general articles and one exhibit denominated "Scope of Services." Among those general provisions, Articles 6, 7 and 10 are of particular importance to the resolution of the issue before us.

They read in pertinent part:

**Article 6. Limitation of Cost**

A.  It is estimated that the total cost to the CLIENT, exclusive of any fixed fee, for the performance of work pursuant to this agreement, shall not exceed THREE HUNDRED FORTY-TWO THOUSAND, FOUR HUNDRED, TWENTY-FOUR DOLLARS ($342,424.00). This amount reflects the estimated costs for the SYSTEM DESIGN PHASE - CONTRACT ITEM 1 as detailed in the attached Scope of Services (Exhibit A).

The CONTRACTOR agrees to exert its best efforts to perform the work as specified in Exhibit A, "Scope of Services," and all obligations under this Agreement within such estimated costs. If at any time the CONSULTANT has reason to believe that the costs to be incurred against this Agreement within the next succeeding sixty (60) days, when added to all costs previously incurred, exclusive of any fixed fee, will be substantially greater or less than the estimated total costs set forth in this Article 6, the CONSULTANT shall notify the CLIENT in writing to that effect, giving the revised estimate of such total cost for the performance of this Agreement.

2

B. The CLIENT shall not be obligated to reimburse the CONSULTANT for costs incurred in excess of the estimated cost set forth in this Article 6, unless and until the CLIENT shall have notified the CONSULTANT in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of this Agreement.

\* \* \*

## Article 7. Payment

A. For the performance of this Agreement, the CLIENT shall pay the CONSULTANT allowable costs in accordance with the terms and conditions as set forth above. In addition to the payments for allowable costs as hereinbefore provided, the CLIENT agrees to pay the CONSULTANT the sum of THIRTY-FOUR THOUSAND, TWO HUNDRED FORTY-TWO DOLLARS ($34,242.00), and it is agreed and understood that this will constitute full compensation to the CONSULTANT for fixed fee covering all services and work required by the contract items covered under this Agreement unless such amount shall be amended in writing by the CLIENT.

B. Once each month, the CONSULTANT shall submit to the CLIENT a certified invoice for allowable costs incurred in the performance of this Agreement.

\* \* \*

## Article 10. General Provisions

The following general provisions are incorporated herein and made a part hereof:

A. Changes. The parties hereto may from time to time require changes in the Scope of services and the time of performance as set forth herein. Such changes, including any increase or decrease in the amount of the compensation to the CONSULTANT, which are mutually agreed upon by and between the parties hereto, shall be incorporated as written amendments to this Agreement. Any claim by the CONSULTANT for an adjustment under this clause must be asserted within thirty (30) days from the date of the receipt by the CONSULTANT of the notification of change; provided, however, that the CLIENT may, if equity is obtained, receive and act upon any such claim asserted at any time prior to final payment under this Agreement.

The phases of this agreement were divided into tasks and subtasks. Phase I, Task A, was designated as System Design. Of particular importance are the subtasks of Task A, which read as follows:

> **Subtask A.2.  Functional Design** - The control system to be provided shall be based on UTCS concepts, in particular the UTCS Enhanced software.  However, design tasks to adapt the UTCS concepts for the Metro Nashville and Davidson County system shall be performed by [FRH].

> \* \* \*

> **Subtask A.3.  Computer System Design** - The tradeoff shall be made of alternate computer configurations for the Metro System for both the initial implementation phases and expanded (550) system configurations.  The configurations, which [FRH] shall consider, shall be based on the basic UTCS control concepts.  The UTCS software and any special functions, such as EVRP, shall be examined and their requirements translated into computer requirements.

> Major trade off considerations shall include
> - Speed
> - Storage capacity
> - Instruction repertoire
> - I/O capacity
> - Peripheral complement
> - Protective operating procedures
> - Product line status (previous usage)
> - Reliability
> - Cost
> - Maintenance service

In addition to representing the key portions of the contract in this court's estimation, the above citations exemplify the far-reaching and comprehensive scope of the agreement of the parties with regard to the design and implementation of a computerized traffic control system.

II.  Contractual Relationship and System Limitations

The record reveals that, although this contractual relationship began with much hope and anticipation for the new computerized signal system, UTCS Enhanced software was not what either party to the agreement had hoped it

4

would be. With the onset of the personal computer age, the mainframe-based software designed by Honeywell, Inc., proved ill fit for the task of managing the traffic signals of large U.S. cities. Cities across the country attempting to implement the UTCS Enhanced software had reported extensive problems with regard to the functionality of the system. The deposition of Mr. Gregor reveals that as early as November of 1988, both parties became aware of limitations as to the number of intersections that could be governed by the system. Says Mr. Gregor:

> Q. And when did the City first become aware that there were limitations inherent to the UTCS program?
> A. It would have been either late 1988 or early 1989.
> Q. Okay. In response to interrogatories in this case, the city indicated that they were verbally made aware in November of '88. Does that sound about right?
> A. I believe the word approximately was used.
> Q. Right. And to whom was that awareness conveyed?
> A. The consultant convened a meeting with us in Mr. Harper's office, and I was there, and Mr. Harper was there, I believe Elvis was there. I was, in spite of my best efforts, unable to find meetings -- the notes for it, and that's why I couldn't give you the exact date of that meeting happened.
> Q. And who else was there? You, Mr. Harper, Mr. Moore?
> A. Right. The consultants, of course. I believe Ken Keitt was there on behalf of the consultant. Again, without my notes, I don't remember exactly who was there.
> Q. Okay. And what did the consultants say at that meeting?
> A. Basically they conveyed that they were having problems with UTCS, that they had hit an internal limit of about 240 intersections and that was causing them problems, and they felt that they needed to drop the UTCS and go to a different concept, which would have been a customized development approach. And they conveyed that they could do that within the contract.
> Q. And what do you mean they conveyed that they could do it within the contract.
> A. My understanding was that there was going to be no additional cost to the government.

The concerns discussed in that meeting were addressed again in a 1991 letter from FRH's Systems Engineering Director to George C. Harper, Executive Director and Secretary of the Metro Traffic and Parking Commission. That letter outlined FRH's proposed approach to fulfilling the obligations of the original 1985 agreement as follows:

Faced with the objective of developing an expandable software package that could control an ultimate system size of 550 intersections, and interact with additional system enhancements (i.e. color graphics, multi-terminal access, etc.), FRH exhaustively pursued expansion of the ENHANCED UTCS package until forced to adopt a major course correction in the Nashville System Implementation. This consisted of embarking on an independent development of a completely new control software package which would be free from the Enhanced UTCS's size limitation while providing substantially all of its functional capabilities. The magnitude of effort associated with such major software development programs is usually measured in manyears.

In conclusion, in order to accomplish this task, Frederic R. Harris incurred time, manhour, and direct costs far in excess of what could be estimated if the size limitations of the Enhanced package had been clearly documented in FHWA release manuals. These factors were clearly beyond the control of Frederic R. Harris who sustained diligent prosecution of project work in good faith.

The record below shows, consistent with the aforementioned letter and 1988 meeting, that beginning in 1988, FRH, Inc. incurred expenses; the record, however, is unclear as to what portion of the expenses in question went to developing new software and what portion financed the ill-fated attempt to tailor Enhanced UTCS for the Nashville System. The parties below agree that the expenses connected with this attempted customization are the very subject of this dispute. It further appears from the conduct of the parties here, that the bulk of these expenses in issue were probably incurred prior to December 31, 1991, when FRH submitted the sixth change order, requesting reimbursement in the amount of $287,028.81. Almost two years later, May 12, 1993, George Harper, the Traffic and Parking Commission Chairman, informed FRH, that $122,673 of those costs had been approved and that FRH was to submit a change order for payment. This approval was made conditional upon Metro's acceptance of the system and its unrestricted use of the software. For the purposes of summary judgment, however, both parties stipulated below that FRH, Inc.'s duties under the contract had all but been completed. Although Metro did stipulate for the purpose of summary judgment that FRH, Inc. had agreed to Metro's unrestricted use of the customized software, Metro did dispute FRH's allegation that Metro had finally accepted the system. Metro terminated the contract for the convenience of the government pursuant to Art. 10, section D. of the contract

February 7, 1994. The change order submitted by FRH was never signed by the Purchasing Agent, Director of Finance and the Mayor. At the Summary Judgment Proceeding below, and at all points in the proceeding here, Metro has urged that since the sixth change order was not so signed pursuant to Metro Code § 4.24.020, FRH's claim for expenses incurred prior to that change order cannot be recovered. The government argues that the change order sought modification of an existing financial liability and that payment thereof without approval of the Purchasing Agent, Director of Finance and Mayor would be an ultra vires act. *City of Lebanon v. Baird, 756 S.W.2d 236, 244 (Tenn.1988); Laidlaw Envtl. Servs. of South Carolina, Inc. v. Metropolitan Gov't. of Nashville and Davidson County,* No. 01A01-9610-CH-00479, 1997 WL 706614 (Tenn.Ct.App. Nov. 14, 1997). The court below found, based on *Laidlaw* that the execution of a change order was necessary to bind Metro. This court is of the opinion that *Laidlaw* is distinguish-able from the case at bar on its facts.

Laidlaw Environmental Services of South Carolina, Inc. (Laidlaw), contracted with Metro regarding the removal of fly ash generated by the Nashville Thermal Transfer Plant. The original contract terms required Laidlaw to remove only 15-25 tons of ash per day, with a 15-ton minimum charge paid by Metro. When it became apparent to both parties that the contract was not meeting Metro's needs, the parties attempted a modification. Laidlaw, *2. "Laidlaw's estoppel argument was premised on what it characterized as a city employee's 'interpretation' of a written contract. We held that the purported interpretation was actually an oral contract modification that was barred by Metropolitan Code § 4.24.020." The terms of the contract in *Laidlaw* were clear and unambiguous. *Laidlaw, *6.* In the case at bar, however, the contracting parties allowed for the elastic nature of their relations by contracting on a cost-plus-fee basis where costs were estimated and subject to change. In the plain language of the contract, FRH and METRO allowed for certain "trade-offs" regarding Enhanced UTCS adaptation. The parties admit that the majority of the costs requested in the sixth change order were incurred prior to submission of the proposed change order. As such, the cost term in FRH's contract is distinguishable from the unambiguous language in Laidlaw's agreement. Metro is actually doing in this case what the contractor *claimed* Metro did in *Laidlaw*.

7

Since we distinguish the contract in *Laidlaw*, we remove the major barrier to estoppel which existed in that case.

## III. Ultra Vires, Estoppel and Executed Contracts

The Supreme Court of Tennessee has held:

Under Tennessee law, a municipal action may be declared *ultra vires* for either of two reasons: (1) because the action was wholly outside the scope of the city's authority under its charter or a statute, or (2) because the action was not undertaken consistent with the mandatory provisions of its charter or a statute. thus, the law recognizes a difference between the existence of a municipal power and the manner or mode of exercising municipal power legitimately. *Compare City of Chattanooga v. Tennessee Electric Power Co.*, 172 Tenn. 524, 112 S.W.2d 385 (1938) (existence of power) *with Rutherford v. City of Nashville*, 168 Tenn. 499, 79 S.W.2d 581 (1935) (manner of exercise). As this Court observed in *Memphis Street Ry. Co. v. Rapid Transit Co.*, 138 Tenn. 594, 607-608, 198 S.W. 890, 893 (1917), "[i]t is to be observed that . . . power existed in the municipality to [do the act] in question, but it was limited or qualified as to the mode of exercise. So it is in the case under review; power to act, proceeding properly, was not lacking, but the limitations on its exercise were not regarded."

When a municipality has no power whatsoever to do an act, that any attempt to undertake such action is *ultra vires* is readily seen; the more difficult question is the consequences of a city's failure to do an authorized act in the manner prescribed by its charter or by the statute under which it is attempting to act. In some cases, if the City does an act that does not comply with the law controlling the manner in which it is to be done, the city will be estopped from denying the validity of its act for equitable considerations arising on the facts of the particular case, *Lawrence County v. White*, 200 Tenn. 1, 8, 288 S.W.2d 735, 738 (1956), usually because the city has accepted the benefits of an act it induced another to perform, *e.g., Brown v. City of Manchester*, 722 S.W.2d 394, 397-398 (Tenn.App.1986), or because the city induced a detrimental act of another, *e.g., Bledsoe County v. McReynolds*, 703 S.W.2d 123, 145-125 (Tenn.1985).

* * *

Ultimately, the application of estoppel or implied contract must be determined on the facts and equities of the particular case. The principles of estoppel are well settled and not every case will require application of estoppel or of implied contract. The classic case of estoppel in the present context is the acceptance of the benefits of a contract and the subsequent refusal of a city to pay for the benefits received. *See, e.g., Trull v. City of Lobelville*, 554 S.W.2d 638, 641-642 (Tenn.App.1976).

*City of Lebanon v. Baird,* 756 S.W.2d 236, 241-42, 244 (Tenn.1988).

The courts of this state have long recognized that a city may be estopped from asserting the ultra vires nature of an act if the aggrieved contractor can show that the ultra vires contract is partially or fully executed. *Mayor and City Council of Nashville v.* Hagan, 68 Tenn. 495, 507 (1876); City *of Lebanon v. Baird*, 756 S.W.2d 236, 244 (Tenn.1988); *Trull v. City of Lobelville*, 554 S.W.2d 638, 641-42 (Tenn.Ct.App.1976). This well settled rule of equity and common sense cannot be avoided when a municipality contracts for a benefit, receives and retains it, and then refuses to compensate the contractor for that benefit solely because the city failed to follow its own procedures with regard to the compensation.

IV. Termination for the Convenience of the Client

It bears noting that Metro terminated this contractual relationship under section 10.D of the contract with FRH. That section reads in pertinent part:

> D. Termination for Convenience of Client. The CLIENT may terminate this Agreement at any time by giving written notice to the CONSULTANT of such termination and specifying the effective date thereof, at least fifteen (15) days before the effective date of such termination. In that event, all finished or unfinished documents and other materials shall, at the option of the CLIENT, become its property. If this Agreement is terminated by the CLIENT as provided herein, the CONSULTANT will be paid incurred cost for completed or partially completed work, plus a pro rata portion of the Fixed Fee.

This section of the contract clearly states that some amount is owed to FRH upon termination for the convenience of the government. Metro seems to argue that the plain unambiguous language of subsection D of the contract is trumped by § 4.24.020, which states in pertinent part:

> A. Approval by purchasing agent. Before any change, revision or modification shall be made in any contract requiring the expenditure of money or the relinquishment of rights or privileges by the metropolitan government, such change, revision or alteration shall be approved by the purchasing agent. The purchasing agent shall disapprove any change, revision or alteration of such contract, if in his opinion, the best interests of the metropolitan government require that a new procurement be initiated for the items included in the proposed change or modification. The mayor shall make the

final determination if the director of any affected departments, commission, board or agency objects to the decision of the purchasing agent.

B.    Approval by Mayor and director of law. Any change, revisions or alterations of contracts, deeds, leases or other instruments in writing in which the metropolitan government is concerned shall be approved by the department of law, as provided by section 8.602(e) of the Metropolitan Charter, and shall be signed by the mayor.

C.    Availability of Funds. Where any change, revision or alteration of a contract in which the metropolitan government is concerned requires an expenditure of money the director of finance or his designee must approve the change. Funds must be available or obtainable by means authorized in the Charter or in ordinances. (Ord. 92-210 § 1 (6-102), 1992).

To apply a statute which covers modifications of contract duties to a contract which seeks only the satisfaction of existing duties seems to strain the plain intent of both. Metro and FRH provided the methods of termination in their agreement. Metro chose the method by which it must now live and pay. The question of how much costs it must pay is clearly a question of fact for the court below to address on remand.

Since this case is here on appeal from the grant of summary judgment, our burden is clear. We must determine, viewing the record below in the light most favorable to the non-movant, whether a material issue of fact exists which would preclude entry of judgment for the movant. *See Byrd v. Hall*, 847 S.W.2d 208, 210-211 (Tenn.1993). The de novo review of summary judgment on appeal entails no presumption of correctness. *City of Tullahoma v. Bedford County*, 983 S.W.2d 408, 412 (Tenn.1997). The finding below centered only on the application of *Laidlaw* to the undisputed facts regarding the change order. The court below did not delve into the course of dealing of the parties, nor whether the benefits of this arrangement were actually retained under circumstances which would make it unfair for FRH to go uncompensated. Thus, it is not necessary for this court to address the accuracy of FRH's alleged costs under the contract. Nor is it necessary to decide the appropriateness of Metro's offer to settle the cost issue. It is enough to state that the contract between FRH and Metro was within the power of Metro to authorize. It is a question of material

fact whether or not the contract on the part of FRH is partially executed or fully executed in matters relating to change order number six. *Laidlaw* is not applicable and summary judgment was inappropriate.

The order of the court below granting summary judgment to the Metropolitan Government of Nashville and Davidson County is therefore reversed and the cause remanded for a trial on the merits. Costs on appeal are taxed against the city.

_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE